THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* PERCY L. DAVIS, Appellant.

First Department, April 4, 1913.

**Crime — attempted extortion — evidence.**

Prosecution of a defendant jointly indicted with another for attempted extortion in obtaining money from a woman by threatening to make public and use an affidavit damaging to her and her family. Evidence examined, and *held*, sufficient to sustain the conviction of the defendant.

The exclusion of the testimony of the attorney for the party jointly indicted with the defendant as to what was said to him over the telephone by the woman against whom the affidavit was made was not error, as the defendant had already testified concerning such conversation.

APPEAL by the defendant, Percy L. Davis, from a judgment of the Supreme Court, rendered against the defendant on the 6th day of January, 1913, convicting him of an attempt to commit the crime of extortion.

*Martin S. Lynch,* for the appellant.

*Stanley L. Richter,* for the respondent.

First Department, April, 1913.                [Vol. 156.

DOWLING, J.:

The defendant has been convicted of the crime of attempted extortion, for which he was jointly indicted with one Eben J. Owen. In August, 1912, Viola Dawson, a girl of seventeen years of age, pleaded guilty of the crime of forgery in having procured the cashing of a check for twenty-five dollars, which she claimed she had been paid for wages by Mrs. Eva B. Carroll, the complaining witness herein, in whose employ she had been. Sentence was suspended upon said Dawson, and she was paroled in the custody of the probation officer and one Mrs. Piper. The codefendant Owen, who claims to have been engaged in missionary work, was present in court at the time of the sentence and took the Dawson girl from the courtroom, not, however, to Mrs. Piper, in whose custody she was to be placed, but to the office of his attorney, one Carl Fowler. There she made a certain statement to Fowler in the presence of Owen, as a result of which she returned the next day and signed and verified on August 31, 1912, an affidavit wherein she made a charge of rape against Earl Carroll, the son of the said Mrs. Eva B. Carroll, and charges of complicity in said rape and of grossly immoral conduct against Mrs. Carroll, as well as further charges of immorality against said Mrs. Carroll's married daughter. Earlier on the day that said written statement was made, Owen telephoned to Stillwell Conner, the brother of Mrs. Carroll, asking him to come to his apartment at 29 Broadway, where he was temporarily acting as janitor, and upon said Conner going to the apartment he was received by Owen, who took him into the parlor; there then being present, besides Owen and Conner, Mrs. Owen, defendant Davis, and Viola Dawson.

Shortly afterwards the three last-named persons left the apartment, Davis stating he was quite busy and that Mrs. Owen was taking the Dawson girl to Mrs. Piper. After their departure Owen asked Conner: "Why don't you ask me something, ask me some questions?" Upon Conner professing ignorance as to what kinds of questions he was to ask, Owen told him, "Ask me what the alderman is doing and Mrs. Owen and Viola." Davis was then an alderman of the city of New York. Conner repeated the question as suggested, whereupon Owen

informed him that they had gone to the office of an attorney named Fowler, where an affidavit was being prepared which was very detrimental to Mrs. Carroll and her family. At Owen's suggestion Conner called up his sister, Mrs. Carroll, when Owen said to her that an affidavit was being made that was very detrimental to "Sister Eva" and her family. "Sister Eva" was the manner in which both the defendants Owen and Davis referred to Mrs. Carroll. Thereafter a newspaper man was invited by Owen to attend a conference with Conner, and Owen conversed with him in Conner's presence about a "good story" that was shortly to appear about a "well-known woman." In the meantime the defendant Davis and Mrs. Owen had taken the Dawson girl to the office of Owen's attorney, where the affidavit hereinbefore referred to had been made. On September fourth Conner and the defendant Davis had a conversation in which the latter stated that the former's sister had promised, when he first met her, to help him to go to Congress, and that he was now in a position where she had to do it. Davis having retired after this conversation, Owen took Conner over to Fowler's office, and while Conner was waiting to secure admission Davis appeared and entered the private room, to which subsequently Conner was admitted. At this interview, in the presence of the attorney, both Davis and Owen stated that they knew that the statements contained in the affidavit of the Dawson woman were true.

It appears that Mrs. Carroll and Owen had been acquainted for about two years, he having helped to place her husband in an institution for the cure of inebriates (that being one of Owen's fields of activity), while she had known the defendant Davis about two months. There had been negotiations between them in reference to certain business propositions, none of which eventuated. Their familiarity was such that both the defendants, as has been said, referred to her as "Sister Eva," while she referred to Owen as "Brother Eben." Meantime telephonic communications had passed between the parties, including one with the defendant Davis in which he had told her that the Dawson girl had made a "detrimental vulgar affidavit of forty pages," and that he and Owen wanted to help her out of it, and that they would have to "get together on that

First Department, April, 1913.        [Vol. 156.

right away." Davis also suggested that she should help him to go to Congress, and that when he got there he could do almost anything for her. Later, she had telephonic communications with Davis at Pabst's restaurant, when he found fault because she had not kept an appointment to meet him, and when he made an appointment for the following evening at the same place. In the course of this conversation he said that if she did not get the statement suppressed quickly they would all be ruined (referring to her and her family), and the Associated Press would get the story.

Meantime she had communicated with the district attorney's office, and advised them of the condition of affairs, and her subsequent actions were in accordance with the plan of action agreed upon with the authorities. On the evening of September fourth, when Mrs. Carroll arrived by appointment at Pabst's restaurant, the defendant Davis was waiting for her at the door. He took her hand and said: "Sister, I am awfully glad you come; and we can get everything straightened out to-night."

To this she assented. They then ordered dinner, when Owen came in. In his presence Mrs. Carroll said: "Well, Mr. Davis, what about it? What is this trouble, and what is this meeting, and what is this excitement? * * * This affidavit is a terrible thing." To this he replied: "Yes, it is a dreadful thing. * * * It means ruination to your family."

He repeated verbally the charges contained in the affidavit. Davis conducted the conversation very largely at this dinner, and told Owen to let him do the talking. Davis stated that he could get the affidavit for Mrs. Carroll, but it would take quite a lot of money to do it. This statement he made three times, when she finally asked what he meant by "a lot of money," to which he replied "About $5,000." She finally said that she would give them a check for five thousand dollars, together with a little cash which she had at the house — fifteen dollars or twenty dollars or forty dollars. She stated she was uncertain just how much money it was, but if they came to the house with her she would give it to them. She then wanted to know how they could get the affidavit from Fowler, and if they could get it with money, why could they not get it without money? There-

upon Owen volunteered to telephone to Fowler, and before doing it the three of them put their hands together over the table and swore that they would keep all the transactions occurring that evening a secret between them. This was at the suggestion of Davis. Owen then went to the telephone booth and called up Fowler, and then asked her to speak to Fowler, which she did, asking the person who answered her if he was Mr. Fowler, to which he replied in the affirmative. She then said: "I never met you but one time and we had a little business together, and I am awfully sorry that this affidavit came up, and I don't understand it at all; but  *  *  *  Mr. Davis and Mr. Owen represent that they can make a settlement for me and give me the affidavit." To which he replied: "All right, have Mr. Davis come down about 10 o'clock to-morrow and we will settle it up."

She was uncertain as to whether the voice she heard was that of Mr. Fowler, but she thought she recognized it. They then left for Mrs. Carroll's home, and during part of the time so occupied the defendant engaged in certain vulgar conversation with Mrs. Carroll regarding the affidavit and the charges therein contained. During all this time spent in Pabst's restaurant, the representatives of the district attorney's office were in the same public room, and when Mrs. Carroll gave the signal which had been agreed upon to be given in case the defendants consented to go to her apartments, the officers left before the departure of the three others and were secreted in Mrs. Carroll's rooms when she arrived there. After Mrs. Carroll had spent some time in showing Davis and Owen the pictures in her parlor and referring to certain family portraits therein, Davis said: "Let us come down to business. How about that check for $5,000 ?"

Mrs. Carroll went into the back parlor and returned with her check book, and Davis volunteered to write the check for her. He wrote two checks which by mistake he dated August. The third check he wrote was dated by him September ninth. This check, at the suggestion of Owen, was made out "to bearer," and was then handed to Mrs. Carroll, who signed it and returned it to Davis, who put it in his trousers pocket. Davis then inquired, "How about the little ready cash?" whereupon

First Department, April, 1913. [Vol. 156.

Mrs. Carroll went to another room and returning handed Davis fifteen dollars in three five-dollar bills, which had been previously marked by Detective Maher. This money Davis put in his coat pocket. Owen then started praying, saying, "Praise the Lord," and "Hallelujah," and the defendant Davis said, "Oh, joy, it is done, it is done," and embraced Mrs. Carroll, whereupon all three prayed. Davis suggested the form of the prayer in which they thanked the Deity for giving them the opportunity of protecting Mrs. Carroll from blackmail and scandal the rest of her life. Thereupon the detectives, Maher, Regan and Thayer, who had heard and seen the whole transaction (the two former being in the hallway, the last-named concealed under a bed), presented themselves and placed the two defendants under arrest. Officer Thayer searched Davis and took the $5,000 check from his trousers pocket. Detective Maher took the three bills from his coat pocket and recognized them as the ones that had been previously marked by him with the letter "C." Davis said it was a perfectly legitimate piece of business; while Owen said, "I expected this."

The defendant's theory of his purpose in obtaining the check was that he represented both Mrs. Carroll and the girl, and that he was endeavoring to protect Mrs. Carroll from exposure, and to obtain money to provide for the girl; but the more that he endeavored to make his connection with the matter appear innocent, the more he disclosed his absolute inability to explain why he was not either seeking to compound a felony or to procure money by blackmail. He had been engaged in negotiations with Owen in reference to various business promotions such as a corset company, an automatic dish washer, a change register, an automatic gate and a folding printing press, in all of which fields of activity Owen had found time to engage in addition to his work of "rescuing fallen men and women." Owen was so friendly with Davis that he had given him a note for $5,000, which was to be used in the promotion of Davis' then pending campaign for election to Congress, and this note, together with a letter accompanying it, were still in Davis' possession at the time of his arrest, although they were dated August twenty-second. This note was also payable to bearer, but the letter accompanying it showed that it was given by

Owen to Davis that the proceeds might be used as a contribu-
tion to his campaign fund. In this letter he undertakes to
give certain information as to his financial condition, but it is
not difficult to see upon this record that Owen was without
financial responsibility of any kind. It is significant that the
amount of this note thus given, and payable to bearer, is
identical with the check extorted from Mrs. Carroll, the
amount of which was fixed by Davis, and it is also made pay-
able to bearer, as in the case of the extorted check. When
Davis was interrogated as to why he made the check from
Mrs. Carroll payable to bearer and dated it ahead, if he pro-
posed to turn the money over to this minor, and as to what he
proposed to do with the check after he obtained it, he became
involved in such a mass of contradictions that it was quite
apparent that he was unworthy of belief.

The testimony of the complaining witness, supported as it is
by the testimony of the three officers as to what transpired in
the Carroll apartment, carried absolute conviction as to its
truthfulness, and no jury would have been justified in reach-
ing any conclusion save that which the present jury did; that
is, finding the defendant guilty of the offense with which he
was charged. It was clearly established that an attempt had
been made to extort money from Mrs. Carroll by Davis and
Owen jointly, availing themselves, as the means of pressure
upon her, of the threat to make public and use the affidavit
which had been made by the Dawson girl for Owen's own attor-
ney, to whom Owen had brought her. Davis' complicity from
the outset in this scheme to extort is clearly established, as well
as his purpose to utilize the instrument thus at his hands to
obtain financial support for his political campaign. Of the jus-
tice of the verdict found by the jury we can entertain no doubt.
Many objections and exceptions are urged by the appellant as
grounds for the reversal of the judgment. The case was sub-
mitted to the jury in a very fair and impartial charge, to which
no exception was taken, nor did the defendant request any fur-
ther instructions by the court. We deem none of the excep-
tions now urged to have been well taken. We deem none of the
objections not accompanied by exceptions to be of any merit.
The only objection to which we think any reference is required

First Department, April, 1913. [Vol. 156.

is that error was committed by the court in excluding the testimony of Fowler as to what was said to him by Mrs. Carroll over the telephone from Pabst's restaurant. This testimony was excluded on the ground that he had not sufficiently identified the person who was at the other end of the wire.

We do not think the ruling can be sustained upon that ground, but we deem the testimony entirely immaterial. Davis had already testified as to what Mrs. Carroll said over the telephone. His testimony was that Mrs. Carroll had said, "Is this Mr. Fowler?" and upon his answering in the affirmative, proceeded: "You remember me; this is Mrs. Carroll for whom you drew up a water power transfer some time ago. * * * About this Viola Dawson, I have asked Mr. Davis to represent me in that matter. Anything that he does * * * as my representative in that matter * * * will be perfectly agreeable to me and will meet with my approval." To this Davis claims he heard Fowler reply, "All right."

If Fowler had been indicted, charged with complicity in this conspiracy to extort money, it would, of course, have been material to have allowed him to testify as to what he actually said to her and as to what she said to him, but there is no charge here made against Fowler. It is to be noted that at the time this conversation took place Mrs. Carroll was acting under the instructions of the district attorney's office and was proceeding solely for the purpose of securing the evidence against these blackmailers while they were engaged in the pursuit of their crime. While, therefore, what they said and did in pursuance of their guilty purpose would be material against them, no declarations then made by her could make their crime the less or make their purpose an innocent one. No offer was made of Fowler's testimony as contradicting Mrs. Carroll's nor affecting the question of her credibility, nor was he asked specifically to contradict what she testified to as the conversation between them. Therefore, no basis was laid for any question to Fowler as to what she said, and as to which Davis' version was already before the jury, nor was the testimony in the slightest degree material. In fact, in view of the testimony of the three officers as to what transpired when the check and cash were obtained from Mrs. Carroll, in view of the undisputed finding

of the same in the custody of Davis, and in view of his futile effort to give any credible explanation of his operations in the matter, there could be no successful attack made upon her credibility as to the main questions involved.

We are of the opinion that this judgment is right and should be affirmed.

INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN and SCOTT, JJ., concurred.

Judgment affirmed. _____